**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT DAYTON**

**Loretta Goldsmith,**

        *Plaintiff*,

**v.**                                                                                 **Case No. 3:10-cv-439
Judge Thomas M. Rose**

**Greater Dayton Regional Transit Authority,**

        *Defendant.*

---

**ENTRY AND ORDER GRANTING MOTION FOR SUMMARY JUDGMENT BY DEFENDANT GREATER DAYTON REGIONAL TRANSIT AUTHORITY** (DOC. 13) **AND TERMINATING CASE.**

---

Pending before the Court is Defendant Greater Dayton Regional Transit Authority's Motion for Summary Judgment. Doc. 13. Defendant asserts that Plaintiff Loretta Goldsmith cannot prevail on her claims that Defendant violated the Family and Medical Leave Act of 1993, 29 U.S.C. §§ 2601, *et seq.*, (known as the FMLA), and retaliated against her for asserting rights protected by the FMLA. Defendant asserts that there is no evidence that it violated the FMLA, or retaliated against Plaintiff and that the two-year statute of limitations for claims other than those involving willful intent bars Plaintiff's claim. Because Plaintiff has no evidence that Defendant violated the FMLA or retaliated, the Court will grant Defendant's motion.

**I.    Background**

Plaintiff Loretta Goldsmith was employed by Defendant Greater Dayton Regional Transit Authority (known as the RTA) from 1997 through November 23, 2008, as a bus driver. During this

period, Goldsmith's mother had serious health problems and Goldsmith was approved to take FMLA leave to care for her under the RTA's Absence Control Policy.

The RTA's Absence Control Policy is a "no-fault" policy, meaning that employees are charged with absences anytime they are "not at work when scheduled." All absences not specifically defined as "non-chargeable" by the Absence Control Policy count against employees as charged absences, regardless of the reason for the absence.

Absences that are approved as FMLA leave are defined as non-chargeable. Under the policy, employees receive a written reprimand after they incur nine chargeable absences within a rolling twelve-month period. Employees receive additional written reprimands and attendance counseling after reaching eleven and thirteen chargeable absences. Finally, employees who reach fifteen chargeable absences within a twelve-month period are automatically terminated.

Starting in 2003, Goldsmith was certified to take intermittent FMLA leave to care for her mother and to provide transportation to doctor appointments. (Doc. 13-2 at 121). Goldsmith submitted an FMLA medical certification from her mother's physician each year, and the RTA approved this type of intermittent leave starting in 2003. (*Id.*).

Each time Goldsmith needed to miss work for her mother, she called into the dispatch office and asked for FMLA leave. (Doc. 13-2 at 189, 201-02). The RTA granted these requests and did not count these absences against her under the Absence Control Policy. (Doc. 13-2 at 189-90). In early 2008, Goldsmith was again approved for intermittent FMLA leave to take her mother to 8 to 12 doctor appointments. (Doc. 13-2 at 219-20; Co. Arb. Ex. 13). Goldsmith made several attempts to have her doctor approve a greater number of annual FMLA absences, but the forms she submitted in support of this were incomplete and did not include an increased number of absences from her

doctor. The RTA explained in a letter to Goldsmith that she was approved to take FMLA leave through December 23, 2008. (*Id.*). During the last five months of her employment, Goldsmith called into the dispatch office and asked for FMLA leave to care for her mother on eleven occasions. (Doc. 13-2 at 194; Co. Arb. Ex. 16). The RTA granted these requests and did not count these absences against Goldsmith under the Absence Control Policy. (*Id.*).

Goldsmith had non-FMLA attendance problems throughout her employment with the RTA. (Doc. 13-2 at 39, 41-42; Goldsmith Dep. 40, 43, 56). In the year prior to her termination, the RTA issued Goldsmith five written reprimands under the Absence Control Policy for excessive absenteeism. (Doc. 13-2 at 41-42, 121; Co. Arb. Exs. 1–5). In May 2008, Goldsmith received a reprimand for reaching nine chargeable absences. (Goldsmith Dep. 24). The RTA gave Goldsmith a written reprimand for reaching eleven chargeable absences in June 2008. (Goldsmith Dep. 25). In August 2008, the RTA issued Goldsmith a final written reprimand for reaching thirteen chargeable absences. (Goldsmith Dep. 26). Goldsmith received attendance counseling following this reprimand, and she understood that she was only two chargeable absences away from termination. (*Id.*).

Goldsmith was absent from work on September 5, 2008 and November 11, 2008, was determined to have violated the RTA Absence Control Policy, and terminated. She contends that failure to consider these two dates FMLA leave violated her FMLA rights.

On September 5, 2008, Goldsmith informed the RTA dispatch operator that she needed to leave work early to "visit" or "see" her husband at the hospital. (Doc. 13-2 at 123; Doc. 13-4, Goldsmith Dep. 52-53). Goldsmith did not say anything to the dispatch operator about her husband's medical condition. (Doc. 13-5, Goldsmith Dep. 52-53). She said nothing to indicate that

she needed to take any kind of medical leave away from work. (*Id.*). Nor did she say that she was going to the hospital to provide care for her husband. (*Id.*).

Although Goldsmith was approved for FMLA leave to care for her *mother*, she was not approved to take FMLA leave to visit her *husband* at the hospital. (Doc. 13-2 at 122-123). Goldsmith admits that she did not initially try to get approved for FMLA leave covering the September 5, 2008 absence to see her husband at the hospital, even though she understood the process for doing so. (Goldsmith Dep. 35-36). She did not request FMLA leave when she spoke to the dispatch operator on September 5, 2008 even though she had done so eleven times in the past several months. (Goldsmith Dep. 35-36, 52-53; Co. Arb. Ex. 16). Nor did she submit an application for FMLA leave to care for her husband or an FMLA medical certification from her husband's physician. (*Id.*).

Rather than seeking FMLA leave by bringing in an FMLA medical certification form, Goldsmith sought an excused "leave of absence" under the Absence Control Policy. An excused "leave of absence" is defined as a "Leave of Absence ... authorized by the department head." (Jt. Arb. Ex. 2, § 3(F)). The RTA denied Goldsmith a "leave of absence" because she delayed speaking to a department head about leaving work early on September 5, 2008 until she was facing termination under the Absence Control Policy several months later. (Doc. 13-2, Arb. Tr. pp. 51-52, 56).

Notably, when Goldsmith's husband was discharged from the hospital two weeks later on September 19, 2008, Goldsmith's supervisor granted Goldsmith a leave of absence to take him home, and advised her to inquire as to whether the Human Resources Department would approve care for her husband as FMLA leave. Goldsmith declined to do so.

The other disputed event occurred the morning of November 11, 2008, when Goldsmith called the RTA dispatch office to report that she would be absent that day. (Doc. 13-2 at 204). The conversation was recorded:

> Dispatcher: RTA Dispatch. This is Clarence.
>
> Goldsmith: Clarence?
>
> Dispatcher: Yes.
>
> Goldsmith: This is Loretta.
>
> Dispatcher: Uh-huh.
>
> Goldsmith: I'm not going to make it in there today, Babe.
>
> Dispatcher: Okay. What [do] you have for today, Loretta?
>
> Goldsmith: 509.
>
> Dispatcher: Is that straight?
>
> Goldsmith: Yeah.
>
> Dispatcher: Okay. You're calling in absent or –
>
> Goldsmith: Sick. Well, not me.
>
> Dispatcher: I mean, is it FMLA?
>
> Goldsmith: No, no, no.
>
> Dispatcher: Okay. So it would be absent?
>
> Goldsmith: Okay, yeah.
>
> Dispatcher: Or – are you sick?
>
> Goldsmith: No, I'm not. It's my mother.
>
> Dispatcher: Okay. But it's not FMLA?

>           Goldsmith: No.
>
>           Dispatcher: Okay.

(Doc. 13-2 at 203-04).

Goldsmith's November 11, 2008 absence was her fifteenth chargeable absence under the Absence Control Policy, a level resulting in automatic termination. (Co. Arb. Ex. 7). On November 12, 2008, Goldsmith received a reprimand notifying her of her termination. (*Id.*). The next day Goldsmith called McEntarfer and asked whether her absence could be "excused," or whether she could have a "special FML day" without going through the normal FMLA approval process.[1] (Doc. 13-2 at 124-25; Co. Arb. Ex. 11). When McEntarfer asked Goldsmith why she was absent on November 11, 2008, Goldsmith said she had been "out shopping" with her mother, and that while they were shopping her mother had "caught a cold." (Doc. 13-2 at 126; Co. Arb. Ex. 11). McEntarfer asked Goldsmith whether she wanted to seek FMLA leave for her absence, and again, Goldsmith said "no." (*Id.*).

Approximately one week later, Goldsmith stopped by McEntarfer's office to again discuss the November 11, 2008 absence. (Doc. 13-2 at 127). At this time, Goldsmith asked if she could have a new FMLA certification to care for her mother. (*Id.*). Goldsmith submitted another certification completed by her mother's physician on November 24, 2008. (Doc. 13-2 at 128-29). However, the RTA determined that Goldsmith's November 11, 2008 absence did not qualify as FMLA leave for two reasons. (Tr. pp. 126, 130-31; Co. Arb. Ex. 11). First, Goldsmith did not

---

[1] Goldsmith attempts to establish several facts by means of an affidavit that contradicts prior testimony. See Doc. 16-2 at 2. Goldsmith affies that she was shopping the day prior to her mother contracting a cold. While this distinction is immaterial, as a cold is not a serious health condition in any event, neither may Goldsmith contradict prior testimony by means of an affidavit.

timely inform the RTA of the need for leave, as she only sought FMLA leave covering her November 11, 2008 absence after learning of her termination. (Tr. pp. 130-31). Second, she did not miss work on November 11, 2008 because of her mother's serious health condition. (Tr. p. 126; Co. Arb. Ex. 11). Accordingly, the RTA did not grant Goldsmith FMLA leave after the fact, as it determined that there was not an FMLA qualifying event on November 11, 2008, and, consequently, did not reverse the termination reprimand she received on November 12, 2008.

On November 26, 2008, Goldsmith filed a grievance under her labor union's collective bargaining agreement, alleging that she was discharged without just cause. (Jt. Arb. Ex. 4). During her grievance, Goldsmith challenged her September 5, 2008 and November 11, 2008 absences. (Jt. Arb. Ex. 5, 6, 7). However, Goldsmith did not argue at the December 3, 2008 Step One grievance hearing or the December 17, 2008 Step Two grievance hearing that either of these absences should have qualified for FMLA leave. (Goldsmith Dep. 30-35; Doc. 13-3 at 45, 46, Jt. Arb. Ex. 5, 6). Instead, at both hearings, Goldsmith asked for a "compassion day" (i.e., a "leave of absence" authorized by the department head) covering these absences. (*Id.*; Tr. pp. 56, 67-69; Jt. Arb. Ex. 5, 6). The RTA determined that Goldsmith was not entitled to a Leave of Absence, and upheld her termination. (Goldsmith Dep. 30-35; Jt. Arb. Ex. 5, 6).

At the Step Three grievance hearing, on January 14, 2009, Goldsmith contended for the first time that her absences on September 5, 2008 should be excused based on "FML qualifying events." (Doc. 13-3 at 47). However, because Goldsmith did not request FMLA leave at the time of these absences, the RTA left its decision to terminate Goldsmith unchanged. (*Id.*).

Following her Step Three grievance hearing, Goldsmith sought arbitration. The arbitrator upheld Goldsmith's termination. Specifically, the arbitrator held that "Loretta Goldsmith was

correctly assessed chargeable absences for Sept[ember] 5, 2008, and Nov[ember] 11, 2008." (Doc. 3-4 at 18-19).

On November 23, 2010, more than two years after receiving notice of her termination, Goldsmith filed a complaint alleging that the RTA interfered with her rights under the FMLA and retaliated against her for taking FMLA leave. (Doc. 1 at ¶¶ 25-36). Goldsmith claims that her absences on September 5, 2008 and November 11, 2008 should have been protected by the FMLA.

At the completion of discovery, Defendant filed the motion for summary judgment that is currently under review. Plaintiff having responded, and Defendant replied, the matter is ripe for decision.

## II.     Summary Judgment Standard

The standard of review applicable to motions for summary judgment is established by Federal Rule of Civil Procedure 56 and associated case law. Rule 56 provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. 56(c). Alternatively, summary judgment is denied "[i]f there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Hancock v. Dodson*, 958 F.2d 1367, 1374 (6th Cir. 1992) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986)). Thus, summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The party seeking summary judgment has the initial burden of informing the Court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, admissions and affidavits which it believes demonstrate the absence of a genuine issue of material fact. *Id.*, at 323. The burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S., at 250 (quoting Fed. R. Civ. 56(e)).

Once the burden of production has shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is not sufficient to "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rule 56 "requires the nonmoving party to go beyond the pleadings" and present some type of evidentiary material in support of its position. *Celotex Corp.*, 477 U.S., at 324.

In determining whether a genuine issue of material fact exists, a court must assume as true the evidence of the nonmoving party and draw all reasonable inferences in the favor of that party. *Anderson*, 477 U.S., at 255. If the parties present conflicting evidence, a court may not decide which evidence to believe by determining which parties' affiants are more credible. 10A Wright & Miller, *Federal Practice and Procedure*, § 2726. Rather, credibility determinations must be left to the fact-finder. *Id.*

Finally, in ruling on a motion for summary judgment, "[a] district court is not…obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989). Thus, in determining whether a genuine issue of material fact exists on a particular issue, the court is

entitled to rely upon the Rule 56 evidence specifically called to its attention by the parties. The analysis now turns to the merits of the RTA's motion for summary judgment.

**III. Analysis**

Plaintiff Loretta Goldsmith has asserted two claims against Defendant the Greater Dayton Regional Transit Authority: one for interference with and violation of rights under the Family and Medical Leave Act of 1993, 29 U.S.C. § 2601, *et seq.*, and another for unlawful retaliation for exercising rights protected by the FMLA. Goldsmiths's complaint alleges Defendant "did not...follow[] the statutory and regulatory procedures in [29 U.S.C.] § 2613(c) and 29 C.F.R. § 825.307" and retaliated for trying to exercise her right to leave under the FMLA.

The FMLA creates an entitlement "to a total of 12 work weeks of leave during any 12-month period … [i]n order to care for the spouse, or a son, daughter, or parent, of the employee, if such spouse, son daughter, or parent has a serious health condition." 29 U.S.C. § 2612(a). Under certain conditions, the employee may take the 12-week allotment of FMLA leave intermittently or by working a reduced schedule. 29 U.S.C. § 2612(b).

The FMLA makes it "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise any right that [the FMLA] affords." 29 U.S.C. § 2615(a)(1).

Goldsmith asserts that she should have been approved for FMLA leave on September 5, 2008 and November 11, 2008. She holds this position even though the September 5, 2008 absence was not to provide care to her husband, and she expressly disclaimed FMLA leave on November 11, 2008, and did not change that position until January 14, 2009 and admits that the November 11, 2008 occurrence was related to a cold, which is not a serious health condition. Goldsmith brings

*Walton v. Ford Motor Co.*, 424 F.3d 481 (6th Cir. 2005) to the Court's attention in support of her claim. In *Walton*, the Sixth Circuit explained:

> "[T]o invoke the protection of the FMLA, an employee must provide notice and a qualifying reason for requesting the leave." *Brohm v. JH Props., Inc.*, 149 F.3d 517, 523 (6th Cir. 1998). "The critical question is whether the information imparted to the employer is sufficient to reasonably apprise it of the employee's request to take time off for a serious health condition." *Id.* (internal quotation marks omitted). While an "employee need not expressly assert rights under the FMLA or even mention the FMLA," 29 C.F.R. § 825.303(b), the employee must give "the employer enough information for the employer to reasonably conclude that an event described in FMLA § [2612(a)(1)(D) ] has occurred." *Hammon v. DHL Airways, Inc.*, 165 F.3d 441, 451 (6th Cir. 1999). "[W]hat is practicable, both in terms of the timing of the notice and its content, will depend upon the facts and circumstances of each individual case." *Cavin*, 346 F.3d at 724 (quoting *Manuel v. Westlake Polymers Corp.*, 66 F.3d 758, 764 (5th Cir. 1995)).

*Walton*, 424 F3d at 486.

The notice Goldsmith gave on November 11, 2008, however, was that Goldsmith did not want to utilize FMLA leave. An employee who expressly rejects FMLA leave, even though the employer knows they might qualify for it, does not have their FMLA rights violated when the employer honors their decision. See *Sanders v. May Dept. Stores Co.*, 315 F.3d 940, 944-45 (8th Cir. 2003). "When an employee is made aware of the procedures necessary to obtain FMLA leave and chooses not to seek FMLA protection, the employer does not violate the FMLA by terminating the employee for excessive absenteeism." *Kobus v. College of St. Scholastica, Inc.*, 608 F.3d 1034, 1037 (8th Cir. 2010) (citing *Greenwell v. State Farm Mut. Auto. Ins. Co.*, 486 F.3d 840, 843 (5th Cir. 2007)). Similarly, the information Goldsmith gave on September 5, 2008 did not inform the RTA of an FMLA event had occurred.

Goldsmith next claims RTA violated rights protected by FMLA because, with regard to the November 11, 2008 absence, the RTA "must accept Plaintiff's certification forms for intermittent leave under the FMLA because there is no testimony that the RTA questioned the validity of the certifications or requested a second medical opinion." Doc. 16 at 15. The RTA did not deny her leave because it questioned the validity of the certifications, but because they were untimely submitted.

At a minimum, notice is to be given within "one or two working days of learning of the need for leave, except in extraordinary circumstances where such notice is not feasible." § 825.303(a) (2008).[2] Goldsmith did not switch from expressly rejecting FMLA for November 11, 2008 to requesting it be granted until two months after the last incident. RTA was permitted, under the regulations in force at the time, to deny her request.

Goldsmith next contends that the RTA "interfered with Plaintiff's FMLA rights when McEntarfer required her to recertify in January, April, May, June, July, and November, despite the fact that the information on the forms remained consistently the same." Doc. 16 at 22. Goldsmith fails, however, to direct the Court's attention to any evidence that the RTA engaged in any such harassment. "A district court is not…obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989) . The available evidence that the Court has found is that Goldsmith sought recertification because she was dissatisfied that her doctor had only approved her

---

[2] Goldsmith at times appears to refer to a version of the C.F.R. that was not in effect at the time of the events underlying her claim.

for eight to twelve absences a year. Doc. 13-3 at 57. The forms that Goldsmith filed were incomplete and, where filled out, incomprehensible to a medical layman. Doc. 13-2 at 222-34.

Finally, Goldsmith claims that she was retaliated against for utilizing FMLA leave. The FMLA prohibits an employer from discriminating or retaliating against an employee for taking FMLA leave. See 29 U.S.C. § 2615(a)(2). An employer is prohibited from "us[ing] the taking of FMLA leave as a negative factor in employment actions." 29 C.F.R. § 825.220(c); *Arban v. West Publ'g Corp.*, 345 F.3d 390, 403 (6th Cir. 2003). Employers who violate the FMLA are liable to the employee for damages. 29 U.S.C. § 2617(a)(1); see, e.g., *Bryant v. Dollar Gen. Corp.*, 538 F.3d 394, 397 & n.1 (6th Cir. 2008) (noting that damages are awarded pursuant to 29 U.S.C. § 2617). When, as here, a plaintiff lacks direct evidence of retaliation, a plaintiff may utilize the burden shifting analysis set forth in *McDonnell Douglas* to avoid summary judgment. See *McDonnell Douglas v. Green*, 411 U.S. 792 (1973).

Under the burden shifting analysis a plaintiff must establish that:

> (1) she was engaged in an activity protected by the FMLA; (2) the employer knew that she was exercising her rights under the FMLA; (3) after learning of the employee's exercise of FMLA rights, the employer took an employment action adverse to her; and (4) there was a causal connection between the protected FMLA activity and the adverse employment action.

*Killian v. Yorozu Automotive Tenn, Inc.*, 454 F.3d 549, 556 (6th Cir. 2006) (citing *Arban*, 345 F.3d at 404). Plaintiff "bears the burden of demonstrating a causal connection ... and must show that the employer's stated reason for [termination] was pretextual and that the true reason for [his] dismissal was [his] medical leave." *Id.* If the employee establishes a *prima facie* case of discrimination under the FMLA, then the burden shifts to the employer to offer a legitimate non-discriminatory reason for the termination. *Edgar v. JAC Products, Inc.*, 443 F.3d 501, 508 (6th Cir. 2006). The instant

case involves the fourth prong of the analysis—whether Plaintiff has demonstrated a causal connection between the protected FMLA activity and his termination. Plaintiff asserts that it can be inferred because of a temporal connection.

A Sixth Circuit panel recently stated that the Circuit has not adhered to a uniform approach on whether a causal connection may be established solely on the basis of temporal proximity. *Krumheuer v. GAB Robins N. America, Inc.,* 2012 WL 1700702, *5 (6th Cir. 2012). In certain cases, it has concluded that temporal proximity alone was sufficient to establish a *prima facie* case of FMLA retaliation. See *DiCarlo v. Potter*, 358 F.3d 408, 422 (6th Cir. 2004) (finding that Plaintiff was terminated by his employer twenty-one days after he engaged in a protected activity was "significant enough to constitute indirect evidence of a causal connection so as to create an inference of retaliatory motive"); *Muhammad v. Close*, 379 F.3d 413, 417–18 (6th Cir. 2004) (same). But it has also stated that "temporal proximity is insufficient in and of itself to establish that the employer's nondiscriminatory reason for discharging an employee was in fact pretextual." *Skrjanc v. Great Lakes Power Serv. Co.*, 272 F.3d 309, 317 (6th Cir. 2001). The Circuit has applied the *Skrjanc* rule, however, to the general context of retaliation cases. *Krumheuer*,*5.

In the instant case, Plaintiff asserts "temporal proximity alone establishes a causal connection as the adverse employment action occurred very close in time after the protected activity." Doc. 16 at 25. Plaintiff does not state what protected activity it was that the adverse employment action followed very close in time. Notably, the requests for FMLA leave for September 5, 2008 and November 11, 2008 did not occur until after the RTA gave her a reprimand of termination. Thus, the temporal relationship is inverted and impossible to state as a cause-and-effect relationship. All other instances of FMLA-protected activity, which began in 2003, are too attenuated from Plaintiff's

2008 discharge to satisfy the casual connection element of the *prima facie* case Plaintiff needs to establish.

Plaintiff next urges the Court to draw a negative inference as done in the unpublished Sixth Circuit case of *Stimpson v UPS*, 351 Fed. App'x 42 (6th Cir. 2009), in which the Court should

> consider whether Plaintiff "gave the employer notice of his intention to take leave." *Cavin*, 346 F.3d at 719. The pertinent regulations state that the notice provided by the employee "shall provide sufficient information for an employer to reasonably determine whether the FMLA may apply to the leave request." 29 C.F.R. § 825.303(b). "[T]he employee need not expressly assert rights under the FMLA or even mention the FMLA" in order to provide his employer with proper notice. *Id.* Instead, the employee must merely "give[ ] the employer enough information for the employer to reasonably conclude that [an FMLA-triggering event] has occurred." *Hammon v. DHL Airways, Inc.*, 165 F.3d 441, 451 (6th Cir. 1999). This notice should lead the employer to "inquire further of the employee if it is necessary to have more information about whether FMLA leave is being sought by the employee, [sic] and obtain the necessary details of the leave to be taken." 29 C.F.R. § 825.302(c).

*Stimpson v. United Parcel Service*, 351 Fed. App'x 42, 47, 2009 WL 3583466, *4 (6th Cir. 2009). Plaintiff ignores that on November 11, 2008 Defendant did inquire as to whether FMLA leave was being sought by the employee and was unambiguously told, "No, no, no." Doc. 13-2 at 203-04. Moreover, neither the hospital visit to her husband, nor the cold Plaintiff's mother contracted shopping qualify as FMLA events. The first as it did not necessitate care from Plaintiff,[3] the second because it was not a serious health condition.

The Court finds no need to address whether Plaintiff's claims of interference with FMLA rights is barred by the two-year statute of limitations for FMLA violations that are not willful.[4]

---

[3] Plaintiff was granted leave to care for her husband when he was released.

[4] The FMLA provides a statute of limitations that varies, depending upon the intent of the alleged violator:

Neither does the Court need to reach the question of deference to the arbitrator's decision, because even without deferring to the arbitrator's findings, the RTA is entitled to summary judgment.

**IV.     Conclusion**

Because Plaintiff has no evidence that could allow a jury to determine that Defendant interfered with Plaintiff's FMLA rights or retaliated for Plaintiff's exercise of FMLA rights, Defendant's Motion for Summary Judgment, doc. 13, is **GRANTED**. The captioned cause is hereby **TERMINATED** upon the docket records of the United States District Court for the Southern District of Ohio, Western Division, at Dayton.

**DONE** and **ORDERED** in Dayton, Ohio, this Tuesday, July 3, 2012.

s/Thomas M. Rose<br>
THOMAS M. ROSE<br>
UNITED STATES DISTRICT JUDGE

---

(1) In general
Except as provided in paragraph (2), an action may be brought under this section not later than 2 years after the date of the last event constituting the alleged violation for which the action is brought.

(2) Willful violation
In the case of such action brought for a willful violation of section 2615 of this title, such action may be brought within 3 years of the date of the last event constituting the alleged violation for which such action is brought.

29 U.S.C. § 2617(c).